UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Urgent Care Physicians, Ltd.,           Case No. 21-24000-beh

           Debtor-in-possession.          Chapter 11

## DECISION ON CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION

The debtor, Urgent Care Physicians, Ltd., seeks confirmation of its plan of reorganization filed under Subchapter V of Chapter 11 of the Bankruptcy Code. After considering the evidence of record and the legal arguments of the parties, the Court concludes that the debtor's plan may be confirmed under 11 U.S.C. § 1191(b).

### BACKGROUND

The debtor operates an urgent care clinic in Appleton, Wisconsin. It provides what is characterized as "acute care" or "short term care" (as opposed to chronic or long-term care) 365 days a year. Its services include routine physicals and occupational exams, diagnosing and treating illness and injuries, and conducting laboratory work and other diagnostic tests. The debtor employs 15 full- or part-time employees (but intends to hire two additional part-time employees in the near future, to reach its full staff of 17), including 11 medical professionals of various levels of skill: one physician (Dr. Bobby Yun, who is also the debtor's president and majority shareholder); two physician assistants; one registered nurse (Mary Yun, who is Dr. Yun's wife and a minority shareholder of the debtor); one licensed practical nurse; two medical assistants; and four licensed radiographers.

Although Dr. Yun's primary employment is with the debtor, he also provides physician services approximately twice a month (in two 12-hour shifts) as an independent contractor at Door County Medical Center. He does

this through his wholly-owned corporation, Yuniq Care, Inc. In addition, Dr. Yun via Yuniq Care provides physician services for NEW MD, a company owned by his wife. NEW MD operates out of the same building as the debtor. Although Dr Yun currently provides his services to NEW MD free of charge, he expects to be paid as an independent contractor when NEW MD starts making money steadily.

The debtor filed its plan of reorganization under Subchapter V on October 13, 2021. ECF No. 87. The plan designates four classes of claims. Class 1 consists of non-tax priority claims, of which there are none; Class 2 consists of the secured claim of Bank of America, N.A., which is impaired; Class 3 consists of the secured claim of the United States Small Business Administration, which is unimpaired; and Class 4 consists of general unsecured claims, which are impaired.

The plan proposes to pay all allowed claims over three years, and the debtor intends to fund plan payments from two sources: (1) its ongoing operating cash flow, and (2) proceeds from a $350,000 Economic Injury Disaster Loan (EIDL) obtained through the U.S. Small Business Administration. As to the latter, the timing of the receipt of these funds is uncertain. The debtor explains:

> Prior to filing, during the height of the pandemic in 2020, the Debtor had obtained a $150,000.00 EIDL program loan from the SBA, which it used to sustain its operations during that difficult time. Shortly after filing this case, the Debtor obtained approval to accept the EIDL increase which was offered by the SBA, in the amount of $350,000.00, as set forth in the motion filed as docket # 42 and approved in the order at docket # 59. Despite having submitted the acceptance of the loan, the Debtor is still waiting for the loan to fund, and has not yet received the $350,000.00 EIDL payment.

ECF No. 87, at 4.

The debtor submitted two sets of financial projections in support of plan confirmation: one set of projections contemplating the receipt of the additional EIDL funds prior to the effective date of the plan, and another set without any

additional EIDL funding to contribute to plan payments. In the first scenario, the debtor projects a total payout of $26,000 to general unsecured creditors (a distribution of approximately 3%), and in the second scenario, the unsecured creditors are expected to receive $0.

Of the two impaired classes entitled to vote, Class 2 accepted the plan, while Class 4 rejected it. Although no creditors objected to confirmation of the plan, the U.S. Trustee filed an objection, asserting that the plan could not be confirmed for two reasons: (1) the plan was not proposed in good faith as required by 11 U.S.C. § 1129(a)(3), and (2) the plan is not feasible as required by 11 U.S.C. § 1129(a)(11). *See* ECF No. 95.

The Court held an evidentiary hearing at which Dr. Yun and the U.S. Trustee's auditor testified. The parties subsequently presented oral arguments, and counsel for the U.S. Trustee advanced a somewhat reformulated version of his original "good faith" argument, asserting instead that the plan's three-year term was not "fair and equitable" under section 1191(b). For the reasons that follow, the Court will overrule the objection and confirm the debtor's plan.

## DISCUSSION

### A.    Confirmation under 11 U.S.C. § 1191

The statutory requirements for confirmation of a Subchapter V plan are contained in 11 U.S.C. § 1191, which incorporates all the confirmation requirements of section 1129(a), other than 1129(a)(15).

A plan may be confirmed as a consensual plan under § 1191(a), or as a nonconsensual plan under § 1191(b). To be confirmed under either provision, the plan must meet the requirements of subsections 1129(a)(1)–(7), (9), (11)–(14), and (16). A consensual plan also must meet the requirements of subsections 1129(a)(8) and (a)(10). If a debtor fails to satisfy either of those additional requirements, the plan may be confirmed as a nonconsensual plan under § 1191(b), if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

The Court first will consider whether the debtor's plan complies with the applicable requirements of § 1129(a).

### 1. 11 U.S.C. § 1129(a)(1)

This subsection of the Code requires that "[t]he plan complies with the applicable provisions of this title." The "applicable provisions" are those concerning the structure and content of the plan. In a Subchapter V case, they include § 1122, which governs the classification of claims; § 1123(a), subsections (1) through (7), which govern the designation of classes and disclosure of impairment and treatment of claims; and § 1190, which imposes additional content-requirements in Subchapter V plans. Based on a review of the plan and testimony offered, I conclude that it complies with the applicable provisions of the Code.

### 2. 11 U.S.C. § 1129(a)(2)

This subsection of the Code imposes the requirement that "[t]he proponent of the plan complies with the applicable provisions of this title." Here, the Court primarily looks to whether the plan proponent has complied with the disclosure and solicitation requirements of the Code, such as section 1126, in soliciting votes on the plan. No one has argued that the debtor here has failed to do so.

Although there was some disagreement over whether the debtor was required to obtain court approval under 11 U.S.C. § 364 before accepting several post-petition short-term loans from Yuniq Care, *see* ECF No. 95, at 3, the Court concludes that the debtor's failure to obtain such approval (if required) was harmless error in the circumstances, and therefore not a bar to confirmation. *See 7 Collier on Bankruptcy* ¶ 1129.02[2] (16th 2021) (citing, *inter alia*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) (discussing harmless error in the context of section 1129(a)(1)).

### 3. 11 U.S.C. § 1129(a)(3)

Subsection (a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." Good faith is "generally

interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984). In determining whether a plan has been proposed in good faith, "the focus of the inquiry is the plan itself, which must be viewed based on the totality of the circumstances surrounding the development and proposal of that plan." *In re Multiut Corp.*, 449 B.R. 323, 341 (Bankr. N.D. Ill. 2011). "To find that a plan does not comply with § 1129(a)(3) generally requires 'misconduct in bankruptcy proceedings, such as fraudulent misrepresentation or serious nondisclosures of material facts to the court.'" *Id.* Among the factors courts may consider in making a good faith determination are whether expenses are accurately disclosed, and whether the proposed payments show fundamental fairness in dealing with one's creditors. *Id.* at 342.

In his written objection, the U.S. Trustee asserted that the plan did not meet the good faith requirement because, according to the U.S. Trustee, the debtor is able to pay more to unsecured creditors. Specifically, he suggested that the debtor might be entitled to payments from NEW MD, and that a five-year plan, rather than a three-year plan, would result in greater payment to unsecured creditors.

Although counsel for the U.S. Trustee did not press an express "good faith" argument after the conclusion of the evidentiary hearing, the Court will address it for the sake of completeness.

Dr. Yun testified that NEW MD, which his wife started about two or three years ago, pays rent for the space it occupies, as well as for its use of the debtor's resources. From July through October 2021, the debtor contracted out some of its staff to NEW MD to assist with administering COVID tests during the surge in the Delta variant and commensurate increase in the volume of patients seeking tests. The debtor invoiced NEW MD for the use of its staff, and NEW MD has paid for its use of the debtor's services. Dr. Yun testified that the debtor did not lose any of its own business by contracting out its staff during

those months, because the clinic was slow and patient volume was not at capacity. Now that patient volume is higher, the debtor needs all of its staff. In addition, NEW MD recently hired two new employees, so the debtor will not be contracting out its staff to NEW MD on an ongoing basis.

Based on this testimony, I cannot find that the debtor is owed money by NEW MD, has provided NEW MD services free of charge, or otherwise conferred a monetary benefit to NEW MD at the expense of the debtor's unsecured creditors.

As for the argument that the debtor should be compelled to extend the plan length to five years, the U.S. Trustee appears to have abandoned the position that that a five-year term is required to establish good faith under section 1129(a)(3). Instead, the U.S. Trustee contends that the extension is necessary for the plan be "fair and equitable" under section 1191(b). I will address the U.S. Trustee's revised argument in greater detail below, but to the extent there remains a question of good faith, I conclude that the debtor's failure to propose a five-year plan rather than a three-year plan does not demonstrate a lack of good faith in the circumstances. As one bankruptcy court has explained, the good faith doctrine is a narrow one, and for good reason:

> [T]he good faith inquiry may come into play only if a debtor has satisfied the other applicable conditions set by statute for obtaining bankruptcy relief. Thus, the good faith requirement serves as a final check, or a "catch-all" to prevent misuse of the bankruptcy system.

> Several courts have recognized that a robust application of the good faith doctrine creates a risk that the court's analysis will lapse into an inquiry, that "may clothe subjective moral judgments with the force of law." Further, a broad application of the good faith requirement also would "create an undue risk of judicial usurpation of the legislative power to determine the scope of and eligibility for [bankruptcy] relief."

> Consequently, denial of bankruptcy relief based on a lack of good faith "should be confined carefully and is generally utilized only in . . . egregious cases."

*In re Walker*, No. BR 20-13557 ELF, 2021 WL 1732592, at *16-17 (Bankr. E.D. Pa. Apr. 30, 2021).

In *Walker*, two unsecured creditors objected to confirmation of the individual Subchapter V debtor's plan, arguing that the distribution to their creditor class was inadequate, and that good faith required the debtor to make his best effort to repay creditors, meaning that his three-year plan should be extended to five years. The bankruptcy court overruled the objection, concluding that good faith does not "***inflexibly*** require[] that a debtor make his or her best effort to make every possible resource available for repaying creditors." *Id.* at *6 (emphasis in original). The court further cautioned:

> *[T]he subjective reaction of a bankruptcy judge to a debtor's proposed plan is not the test by which good faith is measured under 11 U.S.C. § 1129(a)(3).* Rather, the good faith determination requires objective consideration of the totality of the circumstances. In the end, the critical issue is whether a plan adheres sufficiently to Bankruptcy Code policy and is sufficiently fair to warrant a finding that it was proposed in good faith.

*Id.* at *7 (emphasis in original).

Here, the plan itself does not appear to be fundamentally unfair to creditors, or inconsistent with bankruptcy policy. There is no evidence that the debtor is incurring unnecessary expenses or providing favored treatment to insiders. Rather, those insiders are sacrificing to help ensure business continuity and creditor repayment. During this case (from the mid-July 2021 filing through November 2021), Dr. Yun has deferred $30,000 in post-petition wages, which will not be repaid by the debtor until after the plan term ends, and he is willing to forego additional income during the term of the plan if needed to ensure the debtor's successful reorganization. Dr. Yun testified that his salary is *supposed* to be $240,000 per year, but he has not received that amount in several years because he adjusts his pay to account for the needs of the clinic.

According to Dr. Yun, his salary also is significantly lower than what his colleagues are paid. Prior to opening the debtor, he had a comparable position with Prevea Health in the Green Bay area, with a salary between $400,000 and $500,000 a year. And when Dr. Yun provides physician services as an independent contractor at Door County Medical Center, his hourly rate for those services is $175, which he said would translate to an annual salary of approximately $370,000. Dr. Yun's wife, Mary Yun, acts as the executive director of the clinic and is paid $75,000 a year, which also is below market. Last year, she received a salary of $110,000 from the debtor, but took a voluntary pay cut. Mrs. Yun was offered a comparable position at another clinic in the area for $150,000 a year, which she turned down. Finally, Dr. Yun's son Jadon performs IT work for the debtor at a rate of $15/hr, which Dr. Yun estimates is 70% less than what Jadon could make doing the same work elsewhere.

In sum, the debtor's principal, Dr. Yun, is foregoing potential, reasonable personal income to keep the business going and to provide needed urgent care services to area patients. And not only have Dr. Yun and his family agreed to accept reduced salaries, but Dr. Yun's other business, Yuniq Care, helped keep the debtor afloat during the COVID pandemic and allowed the debtor to retain its full staff by loaning the debtor between $250,000 and $260,000. Yuniq Care has since written off that loan. Moreover, during this case, Yuniq Care has deferred charges for the debtor's use of its x-ray machine, which average about $2,500 per month. Yuniq Care anticipates deferring additional charges after plan confirmation, to the extent that those monthly charges exceed $1,500. These deferred charges will be repaid only after the debtor makes payments to general unsecured creditors according to the formula set forth in Article 1 of the plan.

### First Alternate Projection – Additional EIDL Funds Received

As stated above, the debtor has offered two alternate projections in support of plan confirmation. The first set of projections anticipates that the

debtor will receive an additional $350,000 in EIDL funding during the term of the plan. Of this amount, the debtor will make a lump sum payment of $22,650 toward administrative expenses, use $315,000 to make a lump-sum payment to reduce the secured claim of Bank of America, and retain $12,350 as a cushion against the normal income fluctuations in the business. According to Dr. Yun, he will personally guarantee the full $500,000 in EIDL funding if the debtor receives the additional $350,000. He already is a guarantor on the debt to Bank of America. In this scenario, the debtor's projected disposable income, minus a $20,000 operating reserve, will be used to make a distribution of approximately $26,000 to general unsecured creditors: $4,000 distributed in October 2023, and another $22,000 in October 2024. The debtor proposes to return the remaining $12,350 to the SBA in November 2023, rather than use those funds to make additional payments to unsecured creditors.

The debtor's budget in this first scenario also includes a yearly expense for staff bonuses. Specifically, the debtor proposes paying its employees (other than Dr. Yun) a yearly bonus of 2.5% every January, amounting to an annual expense of just under $17,000. Dr. Yun testified that the bonuses are necessary to retain good staff who could work elsewhere for more money, and that he would have preferred to offer a 5% bonus given the current difficulties in hiring and retention of qualified staff. For the same reason, the debtor's budget includes a monthly expense of $500 for "staff appreciation." Dr. Yun testified that this budget item accounts for semi-yearly events like holiday parties, as well as staff birthdays and paying for the occasional staff lunch or dinner when the clinic is very busy.

### Second Alternate Projection – No Additional EIDL Funds

The debtor's alternate projections, in which the debtor does not receive additional EIDL funding during the term of the plan, forego any expense for staff bonuses. They also project that the debtor will have $0 in disposable

income to make payments to general unsecured creditors during the term of the plan.

Significantly, however, under both scenarios, if the debtor's profits are greater than expected, the debtor will pay the difference between its *actual* disposable income and its *projected* disposable income as distributions through the plan, which is more than what the Code requires.

All of these facts make up the "totality of the circumstances" the Court must consider in determining whether the plan was filed in good faith. I find Dr. Yun's testimony credible, including his testimony that keeping the debtor open is the best means of maximizing revenue and repaying creditors. The debtor's decision not to voluntarily extend the plan term another two years to pay general unsecured creditors even more than the Code requires is not misconduct or egregious behavior that warrants a finding of bad faith. For these reasons, I conclude that the plan has been proposed in good faith and not by any means forbidden by law.

### 4.    11 U.S.C. § 1129(a)(4)

Subsection (a)(4) requires that any payments to be made by the debtor for services or for costs and expenses in connection with the case be subject to court approval. Article 3.02 of the plan implements this requirement.

### 5.    11 U.S.C. § 1129(a)(5)

Subsection (a)(5) requires the debtor to disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," as well as "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." The debtor's plan discloses the shareholders of the debtor—Dr. Yun (96.02338% Shareholder), Mary Yun (1.92983% shareholder), and two other non-employee medical professionals, Dr. David Beck, MD (1.81287% shareholder), and Reynaldo F. Guzman, RN (0.23392% shareholder)—and states that the plan does not propose to alter the ownership of the debtor, and that all existing shareholders and officers will

continue in their current roles. The Court finds that the continuance of such roles is consistent with the interests of creditors and equity security holders and with public policy.

In addition, Dr. Yun identified four insiders who will retain their employment by the debtor—(1) Dr. Yun himself, (2) his wife, Mary, (3) his son, Jadon, and (4) Mary's son, Christian Zak—and testified about the nature and amount of their compensation. The debtor therefore has complied with section 1129(a)(5).

### 6.    11 U.S.C. § 1129(a)(6)

According to subsection (a)(6), "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." To the extent that this provision of the Code applies, Dr. Yun testified that the debtor is bound by the Medicare rates set by the Centers for Medicare & Medicaid Services (CMS), which the debtor cannot change—and does not purport to change—in the plan.

### 7.    11 U.S.C. § 1129(a)(7)

Subsection (a)(7) requires that each holder of a claim or interest of an impaired class either "(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . ." The plan identifies two impaired classes of claims: Class 2, the secured claim of Bank of America, and Class 4, general unsecured claims. Bank of America has accepted the plan, and two members of Class 4 have accepted the plan. To the extent that the remaining members of Class 4 have not accepted the plan, they will be receiving at least as much as they would have received if the debtor were liquidated under Chapter 7 of this title

on the effective date of the plan, which is $0, according to the debtor's liquidation analysis.

### 8.     U.S.C. § 1129(a)(8)

Subsection (a)(8) requires that every impaired class of claims or interests has accepted the plan. Because Class 4 has not accepted the plan, this provision of the Code has not been satisfied.

### 9.     11 U.S.C. § 1129(a)(9)

In short, subsection (a)(9) requires that the plan's treatment of priority claims complies with the distribution requirements set forth in the Code, unless the holder of the claim has agreed to a different treatment. Applicable here, subsection (a)(9)(A) requires that holders of administrative expense claims under § 507(a)(2) or 507(a)(3)—which include the professionals employed by the debtor and the Subchapter V trustee—will receive, on the effective date of the plan, cash equal to the allowed amount of their claims.

The debtor's plan provides two repayment scenarios. If the debtor receives the additional EIDL funds before the effective date of the plan, the debtor will make a lump-sum payment of $22,650 toward administrative expenses on the effective date, which presumably will satisfy all but a portion of its own counsel's fees, with the remaining balance to be paid in monthly installments of $1,000. If the debtor does not receive the additional EIDL funds by the effective date, all administrative expenses will be paid in monthly payments of $1,000 until paid in full (with a lump-sum payment of $22,650 to be applied to the balance once the EIDL funds are received). Such treatment is permissible in a cramdown confirmation under section 1191(e), which provides: "Notwithstanding section 1129(a)(9)(A) of this title, a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of section 507(a) of this title may be confirmed under subsection (b) of this section."

### 10.    11 U.S.C. § 1129(a)(10)

Subsection (a)(10) requires that at least one class of impaired claims has accepted the plan. Class 2 is impaired and has accepted the plan.

### 11.    11 U.S.C. § 1129(a)(11)

Subsection (a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This subsection is known as the "feasibility" requirement, and "mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *In re Multiut Corp.*, 449 B.R. at 347. A debtor need not show that a plan is guaranteed to succeed; "[o]nly a reasonable assurance of commercial viability is required." *In re 203 N. LaSalle St. P'ship,* 126 F.3d 955, 961–62 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). "The central inquiry is 'whether there is a reasonable probability the provisions of the plan can be performed.'" *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012).

In his written objection, the U.S. Trustee questioned the feasibility of the plan, but did not press this position in subsequent oral argument.

During the evidentiary hearing, Dr. Yun provided credible testimony explaining how he calculated the debtor's projected income and expenses, based not only on his experience working for the debtor over the last seven or eight years, but also during the prior 15 years working in other urgent care clinics. The debtor's slowest months are in the summer, with patient volume decreasing in May through September, and increasing significantly at the end of December through the end of March. During this latter period the clinic treats approximately 50% of its patient volume. There is usually a 30–90-day lag in insurance reimbursements, meaning that an increase in patient volume in December equates to an increase in projected income in the following March. A review of the debtor's monthly operating reports from August through

October 2021 reflects an increase in patient volume each month, in keeping with the debtor's projections.

When examined by the U.S. Trustee's counsel, Dr. Yun explained all of the debtor's proposed expenses sufficiently. He also testified about the debtor's alternate projections in which the debtor does not receive an additional $350,000 in EIDL funding during the term of the plan. Although Dr. Yun agreed that those projections are somewhat "shaky," he still believes the debtor will be able to operate within the proposed budget.

Based on this testimony and given the lack of any continuing objection to the feasibility of the plan, the Court finds that the debtor has established, by a preponderance of the evidence, that confirmation is not likely to be followed by the liquidation, or the further financial reorganization of the debtor.

### 12. 11 U.S.C. § 1129(a)(12)

Subsection (a)(12) requires that all statutory fees have been paid or will be paid on the effective date of the plan. Article 3.04 of the plan implements this requirement.

### 13. 11 U.S.C. § 1129(a)(13)

Subsection (a)(13) concerns the payment of retiree benefits, which the debtor is not obligated to pay, and therefore this provision does not apply.

### 14. 11 U.S.C. § 1129(a)(14)

Subsection (a)(14) concerns the payment of domestic support obligations, which the debtor is not required to pay, so this provision likewise does not apply.

### 15. 11 U.S.C. § 1129(a)(16)

Subsection (a)(16) concerns transfers of property by non-profit entities. The plan here does not contemplate the transfer of any property, so this provision is inapplicable.

In sum, the Court finds that the debtor has satisfied all requirements of 11 U.S.C. § 1129(a) applicable to Subchapter V debtors, other than subsection

(a)(8). The debtor therefore may obtain confirmation of the plan by meeting the additional requirements of 11 U.S.C. § 1191(b).

## B.     Non-consensual plan confirmation under § 1191(b)

Section 1191(b) of the Code, which allows a debtor to obtain a nonconsensual, or "cramdown," confirmation, provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1191(b).

The "fair and equitable" test under Subchapter V is set forth in section 1191(c). Relevant here, it requires the following:

(1)   "As of the effective date of the plan . . . the plan provides that all of the projected disposable income[1] of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan," § 1191(c)(2)(A);

(2)   "The debtor will be able to make all payments under the plan; or . . . there is a reasonable likelihood that the debtor will be able to make all payments under the plan," § 1191(c)(3)(A); and

(3)   "[T]he plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made," § 1191(c)(3)(B).

At oral argument, counsel for the U.S. Trustee asserted that, to satisfy the requirement that the plan be "fair and equitable" with respect to Class 4, the debtor should be required to extend the plan term to five years to provide an additional dividend to general unsecured creditors (who currently stand to

---

[1] For a business entity Subchapter V debtor, 11 U.S.C. § 1191(d) defines "disposable income" as the debtor's income that is not reasonably necessary "for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor."

receive a distribution of approximately 3%). Counsel acknowledged that there is very little caselaw guidance as to whether and when it would be appropriate for the Court to require a Subchapter V debtor to make payments for a longer period than proposed in the plan. The Code itself does not include factors to consider in this determination.

Counsel for two of the three unsecured creditors who voted to reject the plan, Dr. Dias and Dr. Vongsa, similarly stated that their clients would prefer a five-year plan term but had no authority to supply in support of the argument. Counsel for Bank of America, on the other hand, suggested that a five-year plan term might prejudice her client, because the bank's loan matures in 2024, and while the current three-year plan provides for payment on the maturity date, a five-year plan might propose to restructure the loan on less favorable terms.

The debtor's attorney also conceded that there currently is very little guidance for courts on the application of the plan-term requirement of section 1191(c)(2), but directed the Court to a secondary source analogizing the new provision of Subchapter V to a similar requirement in Chapter 12 cases, under § 1225(b)(1).[2] According to this authority, one reason to extend the commitment period could be a debtor's deduction from projected disposable income of amounts required for anticipated capital needs or expenses to grow the business.

In response to this suggestion, counsel for Dr. Dias argued that Dr. Yun's provision of physician services to NEW MD free of charge was akin to a capital expense, in that Dr. Yun *could* be using the time spent for NEW MD working for the debtor instead and making the debtor more profitable. In other words, he argues, Dr. Yun's/Yuniq Care's investment of time in NEW MD

---

[2] *See* Hon. Paul W. Bonapfel, *Guide to the Small Business Reorganization Act of 2019* at 113–121 (2020). A copy of this guide is available at https://www.ganb.uscourts.gov /sites/default/files/sbra_guide_pwb.pdf. Judge Bonapfel originally issued the Guide in February 2020 and has updated the Guide several times. This Court reviewed the version that was revised and updated in July 2021.

corresponds to an income deduction for the debtor, so it would be more equitable to extend the plan term to five years.

This analogy is inapt. The purpose of extending a plan term in exchange for allowing the debtor a deduction for capital improvements is to allow creditors who are essentially funding the business for the future benefit of the debtor to partake in that future success. *See* Bonapfel, *supra* note 2, at 121. Dr. Yun is the managing member and physician employee of the debtor. But Dr. Yun is not the debtor. Dr. Yun's/Yuniq Care's investment of time in NEW MD is not akin to a capital expenditure that increases the value of the *debtor*.

While creditors may object to the financial terms of a plan and the equity of a proposed distribution, those concerns are not really the substance of Dr. Dias's argument here. Instead, he challenges the debtor's business judgment. Dr. Dias argues that the debtor should utilize more doctors, or more physician-hours, in running its business to increase profits. But there is no record evidence to support such a change in operational structure. Dr. Yun has worked for more than 20 years in urgent care settings and is familiar with the patient volume fluctuations and seasonal needs of the debtor. Based on the record, the Court is confident that he is able to allocate the debtor's resources—including his own time as a physician—to maximize the debtor's revenues. Dr. Yun is but one of 11 medical professionals employed by the debtor to address various patient needs. It does not logically follow that, by spending some of his time providing physician services for entities other than the debtor, such as NEW MD, Dr. Yun is reducing the net income received by the debtor—or that the debtor's revenue would increase if Dr. Yun put in more hours.

Admittedly, the debtor's plan does allow the debtor to retain an operating reserve of $20,000, which could otherwise be used to make plan payments as part of the debtor's disposable income. But Dr. Yun also provided testimony as to why such a reserve is necessary in light of the nature and timing of the debtor's income and expenses. An operating reserve is needed to protect against shortfalls in cash on hand attributable to the cyclical nature of the

insurance reimbursements the debtor receives, so that the debtor can make large recurring monthly or bi-weekly payments such as rent and payroll.

Moreover, the debtor has deferred during this case, and will continue to defer after plan confirmation, the payment of other expenses that either would qualify for priority treatment as administrative expenses or could be deducted from the disposable income calculation as necessary expenditures, well in excess of the $20,000 reserve. Through November, Dr. Yun has deferred $30,000 in post-petition wages, which will not be repaid by the debtor until after the plan term ends. In this same period Yuniq Care has deferred $12,553.09 in charges for the debtor's use of its x-ray machine. In addition, during the term of the plan Yuniq Care will cap its monthly x-ray charges at $1,500. Dr. Yun testified that the monthly charges for such use are, on average, $2,500, meaning that an additional $36,000 in charges likely will be deferred over the life of a three-year plan. (At the same time, Yuniq Care is required to make a monthly loan payment of $5,600 for its x-ray machine.)

Absent express guidance in the Code to assist bankruptcy courts in assessing whether to impose a three-year or a five-year plan term, the legislative history of the Small Business Reorganization Act of 2019 (SBRA), which created Subchapter V of Chapter 11, is instructive.

The purpose of the SBRA was to "streamline the bankruptcy process by which small businesses debtors reorganize and rehabilitate their financial affairs." H.R. Rep. No. 116-171, at 1 (2019). Although Congress previously had attempted to increase the chance of successful reorganizations for small business debtors by passing the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, this measure proved to be insufficient. As the Report from the House Committee on the Judiciary explains:

> Small businesses—typically family-owned businesses, startups, and other entrepreneurial ventures— "form the backbone of the American economy." By their very nature, however, the longevity of these businesses is limited. According to the Small Business Administration Office of Advocacy, approximately 20 percent of small businesses survive the first year, but by the five-year mark

only 50 percent are still in business and by the ten-year mark only
one-third survive. . . . Notwithstanding the 2005 Amendments,
small business chapter 11 cases continue to encounter difficulty in
successfully reorganizing.

*Id.* at 2, 4. As a result, the SBRA created a new Subchapter V of Chapter 11 of
the Bankruptcy Code, which allows certain small business debtors "'to file
bankruptcy in a timely, cost-effective manner, and hopefully allows them to
remain in business' which 'not only benefits the owners, but employees,
suppliers, customers, and others who rely on that business.'" *Id.* at 4.

Congress's recognition that small businesses typically have shorter life-
spans than large businesses suggests that a plan term of three years is more
reasonable, generally speaking (or as a default), than a five-year term, absent
unusual circumstances. And Congress's concern for not only small business
owners, but small business employees, customers, and others who rely on
such businesses, reflects an intent to balance the shorter life-span planning of
small businesses and timely cost-effective benefits to debtors, against the
benefits to creditors.

In this case, a three-year term achieves that balance, by recognizing that
this small business that provides outpatient health care for urgent needs, has
deferred partial salary payments to its insiders, has deferred some healthcare
equipment payments, and has committed to paying at least its projected
disposable income. Imposing a plan term of five years would tip that balance
potentially unevenly toward creditors, because it would further defer
repayments and full salary restoration to key staff. Moreover, deferring full
repayment of the x-ray equipment charges potentially jeopardizes availability of
that equipment. It also would mean keeping a lower-than-desirable ceiling on
employee rewards for an additional 24 months, potentially jeopardizing
employee retention. Forcing the debtor to assume such risks is not in the
interest of the debtor's customers/patients. While at first blush the simple
math of an extended plan term might seem to generate a higher payment to
unsecured creditors, the inherent risks to the small business debtor of that

extension could defeat the unsecured creditors' desire for greater recovery. The three-year term here is fair and equitable, as it properly balances the risks and rewards for both the debtor and its creditors. In these circumstances, the Court declines to fix a longer plan period. *See Walker*, 2021 WL 1732592, at *8 (debtor's choice to put additional money into his three-year plan beyond what the Code required was indicative of good faith). A longer plan term would disproportionately harm the debtor in forcing it to accrue additional unpaid expenses and potentially emerge from its reorganization saddled with more debt. As drafted, the plan complies with the disposable-income requirement of § 1191(c)(2)(A).

The Court also concludes that there is a reasonable likelihood that the debtor will be able to make all payments under the plan, based on the testimony of Dr. Yun and the Court's previous discussion of the reliability of the debtor's projections, so the requirements of section 1191(c)(3)(A) are met.

As for the requirement that the plan provide appropriate remedies to protect the claimholders if payments are not made, the only express remedy in the Code is "the liquidation of nonexempt assets," which the debtor here does not have. There also is scant caselaw discussing what may constitute an "appropriate" remedy for a default under a Subchapter V plan. Moreover, there is no indication that Congress intended section 1191(c)(3)(B) to require anything beyond the preservation of a creditor's rights to seek the enforcement of the plan terms in the bankruptcy court and, if necessary, its rights under applicable state law. To the extent that the debtor fails to pay unsecured creditors its projected disposable income as required by the terms of the plan, this case will remain open and those creditors may seek relief in this Court based on the debtor's default under the plan. Absent any objections or arguments from unsecured creditors insisting on plan language that outlines specific remedies for default with respect to any of their claims, the Court concludes that the plan as drafted, in conjunction with the applicable provisions of the Code, provides appropriate remedies to protect claimholders if

payments are not made. The debtor's plan therefore is "fair and equitable" with respect to Class 4 claimants and can be confirmed under section 1191(b).

The Court will, however, impose one additional requirement on the debtor. Given the current uncertainty of the timing of the debtor's receipt of any additional EIDL funds, funds which factor into the debtor's projected disposable income calculation, and to ensure that unsecured creditors have sufficient information to monitor the debtor's compliance with the plan's provisions, the Court will require the debtor to provide notice to all creditors of the receipt of any additional EIDL funds, within 30 days thereof. With that additional requirement in place, the Court is prepared to enter an order confirming the debtor's plan under section 1191(b).

The Court directs the debtor's counsel to submit a proposed order confirming the debtor's plan of reorganization, consistent with this decision.

Dated: December 20, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge